The next case, number 25-1126, United States v. Stavros Papantoniadis. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good morning. I'm Martin Weinberg. On behalf of the appellant, I would ask to reserve two minutes.  Thank you, Judge. This appeal raises five separate Rule 29 motions. Five of the six counts of conviction are the subject of sufficiency challenges by the appellant, along with the six different sentencing determinations that we contend were imposed to enhance basic offense level without a predicate. This is the second time that this court will address the forced labor statute. The only prior criminal precedent from this circuit is the case of United States v. Bradley. The forced labor statute was passed by Congress as part of the Victim of Trafficking and Violence Protection Act of 2000. Judge Boudin, in the Bradley case, called it a species of involuntary servitude, and the heartland of that statute was not to redress bad employer-employee relationships, and here there was clear evidence of conduct that was far from the ideal of how an employer should address employees. But it was not, we contend, it did not match the elements, certainly, of the court's precedent in Bradley. That was within the heartland of the forced labor statute. They brought summer employees from Jamaica. They confiscated their identification documents. They held them in isolation. They required them to live at the employer's quarters. They charged them rent for the quarters. They charged them a fee for the transportation, and essentially forced them to continue to work, even though they were being paid a fraction of what they were promised, even though some of them wanted to leave. They were threatened with a hitman in Jamaica if they deserted the employment relationship in the New England area. This case, by contrast, each employee went home at night. Each employee had the free will to come back to work the next day. The employees, largely from El Salvador and from Brazil, agreed to work long hours. They agreed to receive cash. They didn't have identification. They agreed many times to work without days off. They were not required to live under the appellant's quarters. When you say they had free will to come back, that implies they had free will not to come back. Yes. That's the issue in the case, is whether that's so. The jury found otherwise. The question is whether there was sufficient evidence. Why wasn't there? Here, because there was no causal relationship between the anger, the threats to the extent they were shown, a single fight that was shown, and a decision by the employee to remain at work when they didn't want to remain at work. There's a lack of the causal link, which was an element of forced labor. But how can you say, this was a quintessential jury question, in light of the evidence, how can you say that no reasonable jury could have concluded that there was that causal link between the conduct of the employer that was described and their belief that they were in a situation that if they failed to come back, if they did not continue to work, if they did not meet the demands of the employer, there would be dire consequences for them, particularly in the form of deportation. Why couldn't a jury reasonably find just that? Because of the testimony, and I'll go through a couple of the more vulnerable counts. Count that he was looking for, not to leave the job, he had left once, he'd come back, nobody had threatened him for leaving, came back a second time, associated the anger of the employee largely, as did the other employees, with their not fulfilling the methodology of making pizza. They didn't work to the employer's satisfaction. But he texted the employer on a Friday night, on Saturday they have a hard discussion with anger about, why did you text me? He wanted the day off to go to a doctor's appointment. The employer said, okay, but you've got to work on your day off. He didn't want to work on his day off. And he said, at that moment, I made a decision to quit. This is the appendix 473 to 6. And I walked out the back door. Now, the employer followed him out the back door and was angry and made a false accident report. But none of it was correlated to requiring or motivating or coercing the employee to come back to work. Their relationship was over when he walked out the back door. And whatever anger and whatever inappropriate communications or behavior there were, were wasn't this an attempt? This account? There's no attempt. The attempt would require an intention to coerce the employee to come back. But isn't that just back to Judge Lopez's question, that that was the issue before the jury. And it was how to understand what the nature of that exchange was and what it reflected. And wasn't there also the crossed hands? There was. And there was no follow up threat. But that was all. But again, the why is, you're saying the jury just could not rationally conclude that that was an attempt to communicate to the employee, you better not quit or I'll report you to be locked up or I'll do violence to you. It was a reaction to the employee saying he was quitting and walking out the door, but it had no correlation to the employee being asked to come back or in fact permitted to come back. This was a case where there was a second employee and I think it almost is characteristic, Mr. Tixera. And by the way, this first employee, there was a three level increase of the sentence for forced labor duration when the only evidence that the employee wanted to quit was a one day, one hour event on the very last day. So my point is this to me, there was simply not an evidentiary predicate for the jury to find the required causal link because the anger, the reaction, the inappropriateness was not to cause the employee to come back to work. It was a reaction to the employee leaving. There was no communication, come back to work or I'll call the police or I'll call the ICA. Counsel, I wonder if we might move off the sufficiency argument to the discovery issues that you raised. Now there, the trial judge found, you might argue favorably to you, that there were significant discovery violations on the part of the government. He was concerned about that. He itemized them, but he then went on to conclude that even though that had happened, there was no reasonable probability that those violations affected the outcome of the trial. In what way do you disagree with that critical conclusion? Because again, there were unmistakable violations here, but the judge made a very careful analysis, having been involved pre-trial and trial, that there was no reasonable probability that affected the verdict. How do you challenge that? Well, the challenge is in the detail. There's no disagreement obviously that a variety of discovery rules were violated, that there was a cascade of discovery, including all of the contents of the defendant's own phone. To be more specific, for example. The examples were that it disclosed within days of trial, the DOL investigation, which itself disclosed that many of the different victim witnesses, and there were six from among hundreds and hundreds of employees, all were incentivized by the DOL investigator. But that was evident from the very beginning. The judge makes the point that you knew about their cooperation with the government from the very outcome, and you were able, even without the benefit perhaps of that additional discovery, you were able to try to impeach them on that very ground. Isn't that so? It was so that they were impeached for having a motive to try to, instead of being smuggled into the country illegally, they had a motive to get a visa that would allow them to stay in the country. But each one was cross-examined as an isolated example of somebody that had a bias that favored the government and favored getting these huge rewards from the Customs and Immigration Service. What there was in the newly discovered last-minute avalanche of papers, 40,000 or more pages, was evidence that there was circumstantial as well as direct evidence that there was a correlation between the decisions of these witnesses, and some of them changed their story and made more inculpatory statements, like Ms. Bonilla, who had a, if not a 180-degree, then a 120-degree change. Counsel, you just mentioned 40,000 pages. This is something I wanted to clarify. My understanding is that the DOL documents were about 18,000 pages. So where does the 40,000 number come from? There was additional discovery that should have been provided in the 28-day period under our local rules. There was witness statements that had not been provided before. There was financial records. There was, at the very last minute, they had 16 witnesses. They narrowed it to seven. Beforehand, they were known by codes, then they were named, and there was, despite the fact that they had a defense team, there was simply not the ability, and we detail it in the appellate brief, not the ability to show collusion, to show that these workers communicated with each other, that day after day, one after another, cut deals with the government, which they hadn't done before. I guess one thing that I understand how difficult it is to get a lot of documents right before trial, but the trial court did give the defense team an extra eight days that you didn't have before. I mean, those were eight new days, and whether the number is 20,000 documents or 40,000 documents, it seems like at least 16,000 of them were the defendant's own business records. If you have a team of three or four lawyers and a paralegal, why isn't eight days enough time to look through those documents? Again, those are eight days you didn't have before. So why was the district court wrong in reaching the decision that those eight days should have been enough, given the content of the documents? I think part of it is just the result, which is that they didn't maximize cross-examination, that documents were found that were detailed in the new trial motion and are detailed in our appellant brief that would show collusion, that would show that it wasn't four or five separate isolated decisions by independent witnesses to cut deals with the government to accuse the same employer, but there was a collaboration. Day after day, the evidence showed that one witness after another made the deals through the Department of Labor. They had the same lawyers, they had the same DOL investigator, and it simply wasn't done. According to the district court, the defense team did do a good job cross-examining the witnesses on collusion in particular, and the district court, to Judge Lopez's question, concluded that any additional sort of punch to the cross-examination wouldn't have made a difference. So given the standard of review here, again, why should we conclude that the witnesses, obviously we're not seeing the cross-exam lot. You know, and I can only come back full circle to the Rule 29s, that there was at least three examples of witnesses, Mr. Tixera had a fight the last day, and the police came and the police told him not to come back to work. That's the antithesis of forced labor. These fights, this anger, was not caused by a desire to reverse an employee's decision to cut quit. It was caused by an angry reaction to that decision. The forced labor statute, which again is part of the involuntary servitude statute, was not designed to rectify employer-employee issues regarding good time, days off, hours worked, wages. It had a very narrow focus, which is to respond to involuntary servitude, to respond to the kind of heartland facts this court dealt with in Bradley, and they were lacking here. Even with Ms. Bonilla, which is count four, you know, she had a generalized fear of the defendant. Her father had been murdered. She saw violence. She was fearful. He said something about having friends in high places, but she admitted it wasn't directed to keep her working. So again, when you look at the instructions, which require the causal link, and you test it against, you know, was it an employee who wanted to leave? Did they stay at work because of fear, because of threats, as opposed to, did they hate being at work, but they were making a lot of money? They were sending it back to Brazil and El Salvador. Some were paying the people that smuggled them there. You know, there is simply the lack of the causal link to the only element that distinguishes the forced labor statute from others, which is... Your Honor, we're past time, and I just wanted to ask you about, am I right that you made evidentiary challenges also? Yes. In particular, with respect to the testimony, I guess it was Bonilla? Yes, Your Honor. Testifying about another employee telling her about an incident of a former employee. This was the pregnant employee. Yes. And I take it you're objecting to that on what ground? Objecting to that on the grounds that although it was said, it didn't affect her decision to remain forced labor. So was that purely a 401 challenge or did you make a 403 challenge? Well, I think that almost every, I mean, it may not have been articulated as under 403, but it was certainly objected to that it was not relevant to the elements of forced labor. Right, but I guess I can, I take it if it's just a pure 401, then all we look at is just whether it was relevant in some way. If it was a 403 challenge, the question would be if the relevance was so marginal, given the potential prejudice, was it a problem that it was admitted on that score? But it sounds like you're saying it was not articulated as a 403 challenge. I would have to check that before I stand up again, Your Honor. But one of them was the Rubin challenge where after somebody was employed, they heard that the defendant deported somebody that couldn't have affected their decision making. That was one of the evidentiary challenges. Another was on Ms. Bonilla's fathers having been murdered and not known to the defendant. As to that first and the last one, the father being murdered, and the other one that you just mentioned, one argument the government makes is even if it was error, it would have been harmless. What's your answer to that? There's just a, I don't know if it's a paradox, but of course, the more irrelevant it is, the less harmful it potentially is. So there's really an error, but who cares because it was actually irrelevant. The Bonilla testimony seems to me not in that category because it was about the defendant's own conduct in the past. But putting that aside because then we just are looking at relevance, on the other two, even if it was irrelevant, what would be the harm? Well, the harm, for instance, of having a witness who was no longer employed say they heard that the defendant on a prior occasion had gotten another employee deported. This is the last one. Yeah. That it interfaces with, it kind of compounds the government's principle argument that the employer was busy threatening people with deportation even though there was no evidence that he caused anybody's deportation. And the judge instructed that there was no evidence he had caused the Rubin deportation, yet it again compounded or augmented the evidence. So it was a prejudice issue rather than a relevance issue. Excuse me. The, on these evidentiary issues, why, why were they not relevant? I mean, the government was arguing that this employer created a coercive atmosphere that created this causal link between his conduct and their fear of leaving. So the relevance, it seems to me there's a strong argument for relevance. But then I think in every instance, the judge gave a limiting instruction. There are hearsay issues here. And he went out of his way to tell the jury, look, this, this is not, you know, this is the legal jargon. It's not being admitted for the truth of the matter asserted. And you should not take it as such. And so doesn't, doesn't that instruction limit the prejudicial impact of the testimony? The instruction negated any potential relevance because this was some unknown source said this or somebody told them that there was hearsay issues. And by the judge trying to balance the hearsay and the relevance, the judge negated any conceivable relevance to the introduction of this evidence, a prior act of aggression, an act of deportation. If they're not being admitted for the truth of the matter stated, why admit them at all? And that was the basis of the relevance. Counsel, I thought that this particular, this particular bit of testimony, the district court's ruling was really that the defense, the defense's cross opened the door to the issue. In other words, there was some dispute about what this witness, this was Hernandez, correct, had said in an affidavit or a declaration that he hadn't mentioned anything about deportation and therefore the government comes back in and, and then on its redirect points out that in fact you had said certain consistent things in the past. So this wasn't a situation where the government brings this in for no reason. It's in response to the defense's cross-examination and that's why the district court ruled as it did from my understanding of the record. How do you respond to that? That the bringing in the Rubin situation through Mr. Hernandez Navarrete, I think he pronounces his name, was just too attenuated as a response to cross-examination and it put right into the middle of this trial. But why was it too attenuated? Well, because the, you know, he was no longer, it was irrelevant. He was no longer working there when he found out about Rubin. In other words, there was nothing about the out-of-court information that came to him post-employment that could possibly have been relevant to a DOL investigation or to the case handling. But just to zero in, and you can tell me if I'm incorrect, but my notes indicate that the defense team on cross-examination challenges Hernandez, suggesting that he hadn't said anything at all about deportation fears or anything having to do with deportation during the DOL investigation. And the fact that he's saying anything about these issues at trial, this is happening for the first time. So they're challenging his credibility, saying you're making this up for trial. And so the government then comes in and on redirect goes into the testimony that you're challenging. And that's why the district court let it in. So in that very specific context, why was the district court's ruling an abuse of discretion here? Because anything relevant to a DOL investigation or anything relevant to the trial of the appellant would have had to be knowledge that this witness had while he was working there. The DOL was investigating the employer. They were asking an employee about conduct that occurred during the employment. And I don't think the defense ever imagined that they would be opening the door to something the man heard a month, a year, two years later about the defendant that had hearsay problems. It was not relevant to his decision to leave, not relevant to whether there was a causal link between what was admittedly bad behavior in this witness's experience, but which we challenged as being outside the forced labor elements, lacking a causal link. The man worked there for years, never asked to leave. And when he left, he left. There was anger when he left, but there was no attempt to get him back. Thank you. Thank you, judge. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the records? Your Honor's name, please support me on behalf of the government. Starting just with the evidentiary issues because I want to clarify a few things there. There were many instructions with respect to two, but not all three in response to Judge Lopez's question with respect to the information about the history, Bonilla's history, and what she observed in her following account. There wasn't a letter of instruction there, but none was requested. And we argued that that's a piece of the kind of history of terrible circumstances that each of them recounted. And there was no objection to the testimony other than just a plain objection that she so testified and no objection after she said what she said, which would preclude another four or three sort of objections that it would respond to in an overly graphic detail, with an objection to the question being asked, you know, what happened, you know, why did she leave, but no objection to the testimony after she came in. And that carries through with respect to the other Bonilla testimony, which has been noted here, which the district court did make a point of giving limited instruction there. There was information she had heard about the defendant striking a person while they were holding the child was only due to the effect on her, and that was clarified by the district court. But again, this was, and the question about whether this was more of a 401 objection, the objection was made at a sidebar of a discussion before the question was asked, and no objection was made to the testimony after it came in that it had dwelt upon it at great length or presented it, in fact, it didn't. It was a very brief statement. I heard that someone had come in and struck the person while they were holding the child, and that was sort of the extent of it. And so if there was no 403 challenge, is that your position? Right. And so then just as to 401, given the limiting instruction, the relevance of it in the government's view is what? The relevance of it is, I mean, the district court's theory of relevance was that it was sufficient evidence to find that when the defendant did certain things, he did them with the intent that they be circulating. In other words, he's communicating sort of public humiliation of employees in front of other employees. He sometimes told employees to tell other employees. Right, but since it can't be used for the truth, that past incident can't be relevant to that fact. Well, it would be for the truth of whether, right, Your Honor, so I think Your Honor has the difficulty with this one in that I do believe that given the limiting instruction, its relevance was only intended to what she would have taken it as, and it was part of her background, circumstances, and what she would have, how she reacted. And why would those have been relevant? In other words, it's a terrible phrase, but for purposes of the forced labor statute, a particularly sensitive, the particular sensitivities unknown to the employer of an employee are or are not relevant? No, and I agree that they're not relevant. So then what is the, there's no indication that the employer, from the Bonilla testimony, that the employer knew of her knowledge of this? That's absolutely correct. So what is the possible relevance of her having heard this from someone for purposes of the crime being charged? I think that's why we rely to a large extent on harmlessness with respect to this one. And that's why I worry, is that even though it's not a 403 challenge, if we now get to thing for the jury to hear, which is that this defendant had taken that action against a previous pregnant employee. Not a pregnant employee, I think it was a person holding a child. Oh, holding a child, okay. To get their check while holding a child. Okay, but still. Just to be clear. Yeah, yeah, you know, yeah, yeah, yeah. But, no, I agree, I think that this one had been relevant. So what, is the idea that it's just overwhelming evidence here? Well, no, I think that this witness herself testified to other violent acts that she, in fact, witnessed. Obviously, the Teixeira event in which she was violently attacked in front of her and next to her. And the testimony was, she was shaking and crying, and she was very strongly affected by that. She also testified to seeing him engage in a fight with another person coming out of the refrigerator and the two were screaming at each other, close to blows, and that she was physically afraid of him. I think even just limiting to this witness and other witnesses testified to other violent acts that they observed or experienced, that there was enough evidence. It was effectively cumulative. She was physically afraid of him. That this, well, again, it had a certain value to it. But I do, that's why I did want to sort of point out that there wasn't an objection to when it came in that it was overly graphic. It was brief. We briefly said it was one or two sentences. Counsel, excuse me, on this relevance issue, this is, I think, a follow-up to Judge Barron's question. I understood the government to argue that independently of what the employer might have known about things that the employees have experienced, what they've witnessed, what's happened to them in their prior life, that goes to the state of mind of the employee that might make them particularly vulnerable to a coercive working environment. You seem to be saying that, again, independently of what the employer knew, their state of mind was somehow relevant to the elements of the offense. Can you explain that to me? I think I'm conceding that I'm not sure in the context. What I said in the brief was that to the extent that the person is testifying to their actual state of mind, that things affected their actual state of mind, and it was admitted under this provision that it be admitted to what its effect on her, it was open to arguing that that was irrelevant because he didn't know, that he had no way of knowing. The judge admitted under the idea of understanding what her experience was and how she was feeling was relevant to what she was saying to explain her other statements, but it would not have direct relevance unless he knew about it or knew that the statement would be transferred or knew that it was true. All of these things are things that the judge did not accept. So I think I'm conceding that the relevance is questionable with respect to the statement because of the combination of limiting instruction and requirement that to be relevant, he has to either be aware of her knowledge of it or have caused her knowledge of it, knowingly, which I think the district court's explanation of its decision suggests that it came in that radical category. Stories like this would circulate about him. Counsel, I understand that you're essentially relying on harmlessness for this one, but I did want to just clarify to make sure we're all on the same page. I understood the testimony to be that the defendant hit the former employee, not the child, correct? Yes. So this is a man that is holding a child who's a former employee, and the defendant hits the man? Yes, correct. Okay. So they said that there was any confusion in the briefing or anything about that? Yes. So it was another example, again, among several of them. And that's why your position is it's harmless, because there is actually quite a bit of testimony about violence against employees. The child had been struck about this, and you've raised many more of the questions about its singularity. On the other evidentiary challenge, which Judge Rickman was asking your opponent about before, that brought in the testimony of the threat of deportation that was heard, communicated by the defendant, in a different circumstance, correct? Yes, the Rubin testimony. The Rubin testimony. What's the government's response on that? Well, I think it would be exactly what Judge Rickman had talked about. The sequence of events in the judge's specific statements, where the defendant opened the door by questioning this particular witness, essentially saying, in your declaration for immigration benefits, you never said anything about deportation or threats of deportation. So to rehabilitate his credibility to say, well, he did, in fact, say that he knew about deportation. And what is your response to whether this matters or not? The timing of the incident that he's then describing relative to the timing that would matter for this case directly. Do you follow what I'm saying? I understand, but I think it's irrelevant to the rehabilitation purpose. The purpose is, did you ever say anything? I guess that's what I'm asking. Was the question put that way ever, or was it in context better understood as, did you ever say anything about this employee during the relevant time period having deported? I don't believe that it was so specific as this employee during the relevant time period. I don't have the cross-examination. I believe the question, again, these are just my notes, but the question was, did you ever say anything about deportation during the DOL investigation? That was my memory, that it was a question related to the investigation. In other words, whether he had said anything at the time of the investigation, whether he learned it while employed or later, but did he? The point was recent fabrication, and the suggestion was that he had not said anything about deportation in the investigation. And our response, very clear, is the first thing we say is, you asked questions about this. Did you, in fact, say something? There was an objection that was a discussment. The court said you opened the door by saying that he hadn't said anything about deportation. Counsel, can I ask you to move to the sentencing issues? Because there's obviously a big dispute about whether various of the decisions the district court made ultimately would have made a difference or not, given the grouping and the other issues. Can you just sort of walk through and give us the government's view of, you know, which of the actual alleged errors here would have made an ultimate difference to the DOL? Because of the way that the grouping worked, the highest one sort of drove the calculation, but then other ones counted for units under the grouping rules. And so when you can imagine a lot of circumstances, and also we had one more than we needed to get the highest level from the grouping rules. So anything above five gets you a five-level increase. There were six units, so you could lose a half or a full unit and still have the exact same GSR. What we particularly point out, and using my brother's language, the perhaps most vulnerable ones that we note is to share us with respect to duration and to share us also potentially with respect to the felony, given the unique wording of the provision, which appears to be unique in all the guidelines and is susceptible to multiple interpretations. Everything appears that they don't intend to say that it has to be classified as a felony, but that that difficult question doesn't need to be resolved, assuming those are the only two errors the court were to note, because those two changes, both assumed to be true to share, would still keep the grouping calculation, the ultimate additions to the grouping to be the same, and there would be no change to the guidelines, and that would be harmless. With respect to just briefly to state the other issues, we think it's very clear that the attempt reduction was appropriately denied because of all the actions that were taken up until the point, even treating it as an attempt with respect to chasing the guy down and making him cross arms. His suggestion seems to be simply that he could have done more, but that's not really the test. The test is whether all the elements were needed to be complete except for actions by an outsider or the victim. In this case, the victim, in that case, continued on, but that's not to say that all the actions of forced labor, if he had stopped and returned, that would have been a forced labor violation. Is it clear under our precedent that if the GSR stays the same under the grouping, but it was error to apply an enhancement, that that is harmless? To be honest, I can't say that I know of one that's applying that to grouping rules. I know that the general rule of this case, or in many cases, is if the guidelines would not change, then it will often be assumed, or maybe not uniformly, generally be assumed to be harmless if the guidelines would not change. Because you could imagine that it might have some anchoring effect on the judge as to his understanding of whether what he's dealing with is somebody who has engaging conduct that triggers various enhancements. If he's operating under that misimpression for purposes of varying from the GSR, that could be different than if he thinks he's not dealing with such a person. Your Honor, I think you're just relying on this court's precedent. In many cases, generally, the fact that GSR doesn't change under multiple different circumstances, I don't know if those include because of grouping, that it would not be harmful. With respect to the felony provision, I guess I was having trouble following the government's view of how we're supposed to construe it, in your view. Well, I think, again, conceding that it's worded differently than any other provision of the guidelines, and it's therefore difficult to find parallels on either side, and I think both parties have sort of struggled with that. What we point out is that, certainly as a general matter, the use of the word felony connotes the sort of federal definition of something with a sentence of more than one year, and that is, in many cases, explicitly noted. In this case, it's not. On the other hand, when they intend to use state classifications, they use the word classification because it's sort of a very particular thing when the court is going to be relying on what a state calls something. I guess what I was having trouble with is it sounds like you're saying it's ambiguous. Well, I think essentially there is a canon of construction that says they know how to do what they mean, and the ordinary use of it throughout the guidelines elsewhere, meaning one year or more, should carry the day. But I understand that it is on its face that context matters here in terms of how this is uniformly applied. I do want to just point out because I think- I just didn't follow that. Are you saying it's ambiguous or not? I think that the provision in context, informed by other provisions, we think it does a better reading, and what it does mean is that it's a felony, but conduct that constitutes a felony- Let me ask you a different way. If it were ambiguous, what should we do? Well, I think in that case the circumstances that you don't need to reach it in this case. That would be true if it were clear also. I just want to make the honest point because- Because lenity would apply, right? I don't know if it's generally considered true that lenity applies. I just want to concede something I don't know for sure. Can I say one point on another issue that was raised? This is the question about the 40,000 pages. I think the place to look is page 1629 of the Joint Appendix. The government kind of walks through what apparently constitutes the 40,000 pages. About 10,000 of those pages were actually used on April 22nd, so well before the motion was filed. There's another 18,000 to 19,000, which is the DL production. Again, 16,000, which were records. This report found it had an index associated with it that's pointing to the right one. There's no 40,000 dumped on him post the motion for a continuance. He mentions the 20,000 at the continuance hearing, so he's clearly aware of it, even though apparently he couldn't open the disk at that time. Finally, what's left is a few hundred pages at most of the information in the A files, which was conceivably late, but which no argument has been made that anything from those would have helped him in any way. There's no claim of harm or prejudice from that disclosure. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself back on the record? He has a two-minute rebuttal. Thank you. Martin Weinberg for the appellant. Three quick points. One is this record was not saturated with multiple fights. Lots of witnesses testified to the same fight, which was a 2013 fight where Mr. Tixera walked and wanted respect. The defendant pushed him. He grabbed his neck. Mr. Tixera went out the door. The police came, and Mr. Tixera was told not to come back. This was the fight that was witnessed by several of the other witnesses, including Ms. Bonita, who had this subjective fear that largely emanated from seeing her father or hearing of her father being stabbed in El Salvador when she was 12. Second, in terms of this, so the fight evidence was prejudicial. The only other evidence, Ms. Bonita talked about somebody being pushed out the door when there was an employee-employee struggle. But the added evidence that came from somebody coming for a paycheck, carrying a young child and having a fight, which she heard about from some unknown source, carried with it prejudice, and when the judge instructed it couldn't be used substantively, it lost any relevance. In terms of this recent fabrication claim about the DOL examination of Hernandez Navarrete, clearly the cross-exam was about what they told the DOL about their employment, not about did you tell the DOL that two years later or a year later you heard from some unknown source about Mr. Rubin. So I contend that the government's using that cross-exam about you didn't say what you said to this jury, to the DOL, was not relating to something irrelevant, it was relating directly to this man's testimony that there was a threat that he hadn't told the DOL about. In terms of sentencing, there are complicated issues. If there was any judgment of acquittal, it would wipe out one unit and reduce the multiple count analysis, which came from Mr. Passos at 27 and added five levels for the other five convictions. But the duration matters, the definition of whether an assault was a misdemeanor or a felony, because every state assault misdemeanor carries with it a maximum over the federal minimum. But the duration's important because if you subtract three levels that was given for five of the six convictions, you take a 25, which was their top base offense level, bring it down to a 22, a 22 is five levels away from 27. So you lose half a unit and if you do it with two employees, it changes the guidelines. I'm sorry, Judge. Very quickly on duration, you seem to attribute to the government an argument that they do not make. You suggest that they argued that the duration of the coercion was basically co-terminus with the, co-extensive with the amount of time that the employee worked. They don't make that argument. They make a more, I understand them to make a more discreet argument that there were periods of time within the period of employment where coercion was present. Where do you get the notion that they make that larger argument that you can simply equate the period of employment with the duration of coercion? I don't see them making that argument. I really make the argument that the court, from the PSR, concluded on each of the six convictions that the period of duration, five of them exceeded the year and the only one that didn't exceed a year is because the employee didn't work there for more than eight or nine months. It had the effect of an undifferentiated imposition that the entirety of the labor was forced labor. There was never a distinction drawn by Judge Saylor that I am only crediting a subset of the labor. In fact, there was no eliciting during the trial testimony and nothing in the PSR that would focus and particularize, for instance, when did the employer threaten you that they knew people of powerful means? When did the employer threaten that if you left there would be some ramification in terms of legal process or worse? It's the government's burden to justify the imposition of a three-level increase in duration. If you look at many of them, you start losing half a unit if you find that the duration was not justified as to employee A because they started two levels below the top base offense level for Mr. Passos. If you go from a 25 to a 22, you're suddenly five levels down from the top level, which subtracts half a unit. If you do that for two employees, you subtract an entire unit and you then come to a different base offense level of 31 instead of 32. And if you subtract it for three or four because the government didn't prove, for instance, a threat to an employee to the extent it's found to be sufficient, they'd improve when it occurred. Am I implicit in what you're saying that if we found a duration problem as to Shachera, that would not change the GSR? If you found only one duration problem for one employee, it would not because it would subtract just a half a unit. And with respect to our precedent on erroneous application of guideline enhancements that under grouping don't affect the GSR, do we have precedent one way or the other whether that is a problem under Gaul or not? Well, I think if there was a guideline error, Judge, repeatedly the court has... Yeah, but a guideline error that matters under our precedent. A guideline error that would cause some change to the base offense level 32 would require... That would require there to be more than either just the duration or just the felony error, correct or not? For any one of the employees. For any one of them. But if there were multiple... The duration error would cut across many of the employees and would result in at least three or four different half units, reductions down from 32, and that would require resentencing. Whether or not a single duration error that resulted in a half unit with no other error... How about that and the felony error? Well, then that and the felony error would... Since they would both be with Mr. Tixera because he had the fight, that's two levels down. Then you have another two levels because he worked less than a year. Four levels from 25 is... Four minus 25 is 21. I hate doing this. But it's 21 versus 27. That's a half unit down. And that by itself would not change under multiple counts, but I... And your position is because it wouldn't change it, yet there was the error, we should do what? You should exercise discretion to return it to the judge because he may have been influenced by the combination of guideline errors. Do you have any authority that suggests that's what we should do? That's what I would request that you do. Do you have any authority that would support that request? No, but I know of no authority that prevents the court from considering the remand based on the two guideline errors. But I would urge the court to look at other employees because if you find Mr. Tixera's duration wasn't proven, you can as easily find that the duration of others weren't proven, and that would add up to being real multiple count reductions. Thank you. Thank you, Judge. Thank you, counsel. That concludes argument in this case.